## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RUBEN R. CRAIG, III, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 23-cv-3608 |
| | : | |
| LAUREL HARRY, *et al.*, | : | |
| Defendants. | : | |

## MEMORANDUM

**Joseph F. Leeson, Jr.**                                                      **March 11, 2025**
**United States District Judge**


Ruben R. Craig, III, a prisoner in state custody currently housed at SCI Benner, filed this

civil rights action pursuant to 42 U.S.C. § 1983 seeking monetary damages and injunctive relief

based principally on alleged violations of his First Amendment rights while housed at SCI

Phoenix ("SCIP").[1]  The Court granted Craig leave to proceed *in forma pauperis* and directed

service on twenty-seven Defendants who were identified by name in the Complaint.  ECF No. 5.

Presently before the Court are motions filed by all Defendants to dismiss the case pursuant to

---

[1]      Craig also seeks a declaration that his rights have been violated in the past.  Declaratory
relief is unavailable to adjudicate past conduct, so Craig's request for this declaratory relief is
improper.  *See Corliss v. O'Brien*, 200 F. App'x 80, 84 (3d Cir. 2006) (*per curiam*)
("Declaratory judgment is inappropriate solely to adjudicate past conduct" and is also not "meant
simply to proclaim that one party is liable to another."); *see also Andela v. Admin. Office of U.S.
Courts*, 569 F. App'x 80, 83 (3d Cir. 2014) (*per curiam*) ("Declaratory judgments are meant to
define the legal rights and obligations of the parties in the anticipation of some future conduct.").
A declaratory judgment is also not "meant simply to proclaim that one party is liable to another."
*Corliss*, 200 F. App'x at 84 (*per curiam*); *see also Taggart v. Saltz*, No. 20-3574, 2021 WL
1191628, at *2 (3d Cir. Mar. 30, 2021) (*per curiam*) ("A declaratory judgment is available to
define the legal rights of the parties, not to adjudicate past conduct where there is no threat of
continuing harm.").

Federal Rule of Civil Procedure 12(b)(6).  For the following reasons, the motions will be granted and the case will be dismissed in its entirety with prejudice.

I.      **PROCEDURAL HISTORY**

After the Defendants initially moved to dismiss the Complaint, *see* ECF Nos. 20, 22, Craig filed an Amended Supplemental Complaint ("ASC") including allegations about events that occurred after the filing of the Complaint, including the circumstances of his transfer to SCI Benner.  ECF No. 26.  The pending motions were denied and the Defendants were directed to respond to the ASC.  ECF No. 27.  Presently before the Court are renewed Motions by all Defendants to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  ECF Nos. 32, 34.  Craig has filed a Responses to the Motions.  ECF Nos. 48, 51.[2]

In an Order filed on December 10, 2024, *see* ECF No. 53, the Court directed the parties to file supplemental briefs addressed to whether Craig's claims under the Religious Land Use and Institutionalized Persons Act ("RLUIPA") were rendered moot by his transfer to SCI Benner as well as the expiration of the ban imposed on his participation in certain religious activities at SCI Phoenix that forms the basis of his claim.  The parties filed responses to the Order.  ECF Nos. 54, 55, 56, 57.  Subsequently, the Court advised the parties that material outside of the pleadings presented by the Commonwealth Defendants as part of their Motion pursuant to Federal Rule of Civil Procedure 12, *see* ECF No. 32, would not be excluded and that the Court would treat the Motion as one for summary judgment under Rule 56 to the limited extent *only* that the Commonwealth argued that Craig had failed to exhaust internal prison grievance procedures regarding his excessive force claim against Defendant Scott Emminger.  The Court

---

[2]      The two docket entries are identical.  Craig apparently refiled the Response believing that prison officials did not properly forward the first version to the Clerk of Court.

directed the parties to present any material pertinent to the exhaustion of that claim no later than

January 31, 2025. Defendant Bauer filed a timely "Motion on Presentation of Materials

Pertinent to Claim Exhaustion," ECF No. 59, stating that he is not in possession of any pertinent

material on the Emminger claim and that the claim is not directed to him. *Id.* The

Commonwealth Defendants filed a timely Notice, ECF No. 60, incorporating their prior filed

materials. Craig failed to submit any materials in response to the Order.

## II.    FACTUAL ALLEGATIONS[3]

### A.    Religious Claims

Craig primarily asserts constitutional claims and a claim under the RLUIPA, but also

raises myriad other allegations in his Complaint and ASC. He names all Defendants in their

individual and official capacities. Compl. at 2. Craig alleges that he is a practitioner of Judaism

who holds traditional religious views, adheres to the tenets of Orthodox Judaism, and is so listed

by the Pennsylvania Department of Corrections ("DOC"). ASC at 2. At SCIP he attended

Shabbat services, Jewish studies classes, and holiday observances. *Id.* Defendant David Dunn

Bauer is a contract chaplain hired by the DOC to minister to the Jewish congregation at SCIP.

He is allegedly a follower of Reconstructionist Judaism, which Craig asserts is a "fringe

community that practices a vaguely Jewish, 'Jewishly-informed' form of secular humanism." *Id.*

Stated briefly, Craig does not agree with Bauer's religious teachings, which he believes to be

cultural Marxism. *See id.* at 2-3. Craig asserts that Bauer harbors "animosity toward traditional,

Orthodox Judaism and its practitioners" and views them as a "hate group" that discriminates

---

[3]    The factual allegations set forth in this Memorandum are taken from the Complaint and the ASC. The Court adopts the sequential pagination assigned to all *pro se* docket entries by the CM/ECF docketing system. Grammar, spelling and punctuation errors in quotes from Craig's submissions are cleaned up where necessary. Where inconsistent, the Court will adapt the spellings of Defendants' names as they provided them in their moving papers.

against Reconstructionist Judaism. *Id*. at 3. Due to his beliefs, Bauer allegedly "failed to demonstrate the neutrality and respect for other Jewish views required from government officials," demeaned Orthodox views, and alienated Orthodox members of the SCIP congregation. *Id*. According to Craig, prior to Bauer taking his position, the majority of attendees of Jewish services "held conservative/orthodox views and there was only a small minority of 'LGBTQ' identifying individuals." *Id*. Craig objected to Bauer's devoting Jewish studies sessions to Kabbalistic mysticism and to teaching it "from a queer theory perspective" and intentionally misrepresenting metaphors contained in the Zohar, a work of Kabbalistic literature. *Id*. at 4. Craig discusses his theological disagreements with Bauer at length in the ASC. *Id*. at 3-4.

On December 6, 2022, Bauer allegedly attempted to impose an indefinite ban on Craig attending religious services because Bauer was offended by a comment that Craig made during a Shabbat service. Compl. at 2. He believes that Bauer interpreted his statement as antisemitic. *Id*. Defendant Rafael Torres, Bauer's supervisor, informed Craig that it was his policy to permit chaplains to deny anyone religious services based on conduct that made the chaplain uncomfortable. *Id*. Craig asked Torres how his policy would apply if Craig said to Bauer that he believed that homosexuality was a sin and Bauer, whom he alleges is gay, denied him services because of that belief, to which Torres responded that Bauer would have his permission to ban Craig. *Id*. at 3. He allegedly told Craig "to keep his religion to himself," made the sign of the cross, and said "God bless you" in a dismissive way. *Id*. On two dates thereafter, Bauer "advocate[d] for transgenderism" during "religious services/study sessions by wearing a pro-transgenderism badge," leading Craig to file a grievance over what he believed to be improper workplace activism and lack of respect for his religious convictions. *Id*. He also took issue with

Bauer's substitution of prayer books with "Reconstructionist" versions that he asserts are not recognized as legitimate by Orthodox believers like himself. *Id.* On another occasion, Bauer directed all in attendance at a study session to introduce themselves and state their preferred pronouns, but Craig refused to do, saying he would not play "pronoun games" because he found it to be an affront to his sincerely held religious beliefs. *Id.* When he refused, Bauer told him "it's not a game." *Id.*

Craig alleges that Torres, in his role as a grievance officer, demonstrated open hostility to him based on his Orthodox beliefs. *Id.* at 3-4. He sent Torres a Request to Staff on July 15, 2023 "to have Torres correct some false claims that were made in the response to a grievance" and request an apology from Torres for allegedly slandering him, but Torres did not respond. *Id.* at 4. Rather, Torres emailed his own supervisor, Gary Olinger, and Olinger's supervisor, Deputy Superintendent Mandy Sipple, advising them that Craig was restricted from participating in Shabbat and holiday observances, and study sessions for a fifteen-month period from July 15, 2023 to September 15, 2024. *Id.* Craig asserts it is unclear what policy or procedure permitted Torres to make this decision. *Id.* Bauer and Defendant Chaplain Abdul-Lateef Sabir[4] notified Craig on July 21 of the ban and told guards on his housing unit to deny any request he made to attend religious activities. *Id.* at 4-5. Bauer apparently identified the incident involving pronouns as a disruptive action by Craig that led to his decision. *Id.* at 5. Craig was warned that he would be sent to the RHU if he attempted to attend a religious program that evening. *Id.*

Craig also had a meeting with Torres and Defendant Chaplain Michael Comick on August 3, 2023, during which Torres unfavorably compared his beliefs to those of Southern

---

[4]     This individual is also referred to as "Chaplain Lateef" on the docket and in the Complaint.

Baptists, refused to state how Craig had been disruptive, and allegedly told Craig to "just keep your mouth shut at services. Just listen to whatever it is the Chaplain chooses to teach, and learn." *Id.* He was also allegedly told to choose a different religion to practice. *Id.* Defendant CO Veronica Valdez refused to permit Craig to attend services on July 21 and July 25, 2023, and created a flyer with his picture and the directive to deny him access to religious services. *Id.* at 5-6. Craig asked Defendant CO Selena Wanamaker to reposition the flyer to prevent other inmates from viewing it, but she refused. *Id.* at 6. Defendant CO Ryan Beatty denied Craig permission to attend religious service on August 18, 2023. *Id.* Bauer denied him access to a study session on August 22, 2023. *Id.* He also responded to a Request to Staff telling Craig that he refused to interact with or counsel him for the duration of the ban. *Id.* Craig asserts claims based on these events against Defendants Olinger, Sipple, John Muick, Derek White, Charles Hensley, Terra, Laurel Harry, Adrianna Rudolph, and a John Doe for violation of his constitutional rights and the RLUIPA. *Id.* at 6-8. He seeks injunctive relief under the RLUIPA to remove restrictions on his access to religious activities, and money damages. *Id.* at 8.

Craig also asserts a claim that Defendant Bauer did not conduct a celebration of Chanukah because he did not come to work on the day of the holiday and Terra, Bissel, Olinger and Torres failed to provide other staff to celebrate the holiday. ASC at 5. He concedes, however, that Bauer's presence was not needed to celebrate the holiday. *Id.*

**B.    Access to the Law Library**

Separately, Craig asserts that on August 26, 2023, CO Alison Grenon terminated his pass to the law library because his shirt was allegedly untucked. *Id.* About one year earlier, on August 13, 2022, Defendant Cara Cloninger terminated his law library session after he questioned her about a DOC policy on access to the law library, requested a grievance form, and

she refused to provide one. *Id.* Defendant David Medina removed him from the law library in November 2022 because he did not like that Craig wrote down the number of a DOC policy and mentioned that he saw Medina asleep. *Id.* at 9. Cloninger also directed that funds be taken from Craig because he had two overdue books, even though, according to Craig, this violated DOC policy.[5] *Id.* at 9. On December 15, 2022, Cloninger issued a misconduct accusing Craig of possession contraband and tampering with prison property when he tried to make a photocopy of a Christmas – New Years holiday closing schedule for the library. *Id.* While DOC policy allegedly requires the law library to open daily, Defendants Phillip Ephraim and Cloninger closed the SCIP eastside library for extended periods over the holiday season, denying access to Craig, who is housed on the eastside, even though the westside library remained open. *Id.* Craig filed a grievance against the library staff alleging retaliation and he was, thereafter, confined to the RHU on administrative custody. *Id.* at 10. He asserts that Defendants Charles Hensley, Terra, and other members of the Program Review Committed ("PRC") did not initially know what the misconduct was for, but ultimately determined that he was investigated and confined to the RHU for reading and discussing the holiday closing schedule.. *Id.* He claims he was held in the RHU for the maximum time allowed without charges before being released, during which time he could not access the law library even though he had legal deadlines pending, as punishment for misusing the law library. *Id.* He also complains that the window in his cell was opaque causing sensory deprivation. *Id.* at 11. He asserts First, Eighth, and Fourteenth Amendment violations based on these allegations. *Id.*

---

[5]    While he alleges the overdue fee violated a DOC policy, Craig does not state how his constitutional rights were thereby violated.

### C.    Use of Oleoresin Capsicum Spray

Craig also alleges he was "attacked with [a] chemical weapon" wielded by Defendant Scott Emminger on September 18, 2021 because he was sprayed with oleoresin capsicum ("OC") spray. He asserts that he was alone in his cell but "would not speak" and Emminger attacked him through the wicket in the cell door. *Id.* He also recounts that on November 20, 2022, CO Anthony Hamilton threatened to use OC spray when he requested to see a copy of a DOC policy. Hamilton's supervisor, CO Andrew Rodriguez, was present but did not intervene. *Id.* He was also exposed to OC spray when CO Green used the substance on another inmate on August 25, 2023.[6] *Id*. at 12. Craig alleges that these uses of OC spray on these occasions violated his rights. *Id.*

### D.    Denial of Books

Craig claims in his Complaint that his due process rights were violated because the prison mailroom refused to deliver two books he had ordered, "Mechatronics For the Evil Genius" and "Complete Guide to Sniping." *Id*. at 12; ASC at 11. Defendant Mailroom Supervisor Long falsified an Incoming Publication Review Committee ("IPRC") denial form for the first book, which Craig claims is a middle school/high school level book about robotics. Compl. at 12. Long told Craig that the IPRC consisted of himself, CO Dusch, and Librarian Ephriam, but Ephriam allegedly told Craig he had not been on the IPRC for five years and had no knowledge of the book. *Id.* He claims another book he requested, "Lighting the Nude," is on a Denied Publication List, he was not approved to receive it, and the book was confiscated, violating his First Amendment and due process rights, but he fails to attribute this to any particular Defendant.

---

[6]    Craig does not list "CO Green" in the caption of the Complaint or the ASC or in the list of Defendants, and provides no other identification for this person. Nonetheless, the Clerk will be directed to add "CO Green" as a named Defendant.

*Id.* Also without attribution, Craig claims to have been denied no less than twelve books and magazines. *Id.* at 12-13.

### E.    Destruction of Sacred Texts

Craig adds additional religion claims in the ASC. He alleges that he had a collection of what he describes to be sacred texts that were no longer usable and he gave them to Bauer to dispose of in a manner conforming with Orthodox Jewish teachings, which he agreed to do. ASC at 4. Two weeks later, Craig tried to give Bauer additional materials for disposal but he refused to take them stating, "I don't want your trash. Throw away your own trash," which Craig alleges denied him a religious accommodation. *Id.* Craig showed him a copy of DC-ADM 819, a policy he asserts applies to disposal of religious materials, but Bauer refused to give Craig information about how he disposed of the first group of materials, leading him to believe that they were not properly handled. *Id.* at 4-5.

Craig spoke with Defendant Torres and asked him to dispose of the materials properly, but he refused to do so. *Id.* at 5. Torres told him that DC-ADM 819 only applies to DOC-purchased items, and that he, Torres, "gets to determine what is and is not a sacred text to an Orthodox Jew." *Id.* Defendant Olinger failed to correct Defendant Torres's alleged violation.[7] *Id.*

### F.    Placement in the RHU

After the named Defendants were notified that Craig had filed this action, he again raised the issue of disposal of sacred texts with Bauer. *Id.* at 6. While unclear how this relates to the disposal of the sacred texts, Craig appears to allege that he received a misconduct accusing him

---

[7]    In a separate part of the ASC, Craig alleges also that new uniforms worn by correctional officers that affix an American flag patch to the sleeve, violate his religious beliefs because he deems the American flag to be a sacred object requiring specific disposal methods just like religious articles. ASC at 10.

of using a homophobic slur concerning his interaction with Bauer.  *Id*. at 6-7.  He claims the misconduct report was dismissed with prejudice following a hearing.  *Id*. at 7.  Nonetheless, he was taken to the RHU later that day, allegedly at Bauer's "behest" and that Bauer requested that he be transferred to a different prison.  *Id.*  The Program Review Committee ("PRC"), consisting of Defendants Hensley, Kertes, Muick, and others, allegedly denied him due process by ordering him transferred to SCI Benner, even though he concedes that he received a hearing prior to the action.  *Id*. at 7-8.   He asserts that Bauer retaliated against him for asserting his right to due process in the misconduct proceeding and for asserting his free exercise right.  *Id*. at 7.  He also complains that paperwork was not filled out and approved by a shift commander before he was taken from his housing unit to the RHU.  *Id*. at 8.  While in the RHU from February 2 to 14, 2024, he was allegedly exposed to raw sewage leaking into his cell through cracks in the wall, RHU staff acknowledged knowing about the problem, he had to eat his meals in these conditions, and his complaints about this were ignored.  *Id*. at 8-9.  He asserts that the staff in the RHU are supervised by Defendant Taylor.[8]  *Id*. at 9.  He also was not permitted access to his personal property, including legal materials, while he was housed in the RHU.  *Id*. at 9.  He asserts that he has been denied access to the courts and the prison grievance process because he did not have access to his legal materials or the law library, the denial of his religious items violated RLUIPA, and the denial of other items violated his equal protection rights and the Eighth Amendment.  *Id*. at 9-10.

---

[8]      There is no Defendant named "Taylor" listed in the Complaint.  Since Craig mentions this person, the Clerk will be directed to add Taylor as a Defendant.

## III.    STANDARD OF REVIEW

"A 12(b)(6) motion tests the sufficiency of the allegations contained in the complaint."

*Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).  In deciding a motion to dismiss under Rule

12(b)(6), the Court must determine whether the complaint contains "sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. (citing

*Twombly*, 550 U.S. at 556).  "Threadbare recitals of the elements of a cause of action, supported

by mere conclusory statements, do not suffice."  *Id.* (citing *Twombly*, 550 U.S. at 555.)

"Although the plausibility standard does not impose a probability requirement, it does require a

pleading to show more than a sheer possibility that a defendant has acted unlawfully."  *Connelly

v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations

omitted).  It is the defendant's burden to show that a complaint fails to state a claim.  *See Hedges

v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (explaining that on a Rule 12(b)(6) motion to

dismiss, the "defendant bears the burden of showing that no claim has been presented").

In resolving a Rule 12(b)(6) motion, "a court must consider only the complaint, exhibits

attached to the complaint, matters of public record, as well as undisputedly authentic documents

if the complainant's claims are based upon these documents."  *Mayer v. Belichick*, 605 F.3d 223,

230 (3d Cir. 2010).  To determine whether a complaint filed by a *pro* se litigant states a claim, a

court must accept the facts alleged as true, draw all reasonable inferences in favor of the plaintiff,

and "ask only whether that complaint, liberally construed contains facts sufficient to state a

plausible . . . claim."  *Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021) (cleaned up)

*abrogation on other grounds recognized* in *Fisher v. Hollingsworth*, 115 F.4th 197 (3d Cir. 2024); *see also Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021) (*pro se* filings are construed liberally).  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  *West v. Atkins*, 487 U.S. 42, 48 (1988).

The Court has provided the parties notice that matters outside of the pleadings submitted by the Commonwealth Defendants will be considered limited to the excessive force claim asserted against Defendant Emminger, converting the motion to dismiss that claim to one filed pursuant to Rule 56.  A grant of summary judgment under Rule 56 is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 585 n.10 (1986).  If the moving party has demonstrated the absence of a genuine dispute of material fact, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial."  *Id*. at 587 (internal quotation marks omitted).  If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  During this process, the Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150 (2000).

However, in order to defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586–87; *see also Podobnik v. United States Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks and citation omitted).  The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).  Facts that could alter the outcome are "material," and a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted).  A party asserting that a fact cannot be – or, alternatively, is – genuinely disputed must support the assertion either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials"; or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A),(B).

## IV.    DISCUSSION

### A.    Official Capacity Claims Against Commonwealth Employees

Craig has named each Defendant in his or her official capacity, asserts that each Defendant other than Bauer is employed by the Commonwealth of Pennsylvania, and he seeks

money damages on his constitutional claims. The Eleventh Amendment bars suits against a state and its agencies in federal court that seek monetary damages. *See Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 99-100 (1984); *A.W. v. Jersey City Public Schs.*, 341 F.3d 234, 238 (3d Cir. 2003). Suits against state officials acting in their official capacities are really suits against the employing government agency, and as such, are also barred by the Eleventh Amendment. *A.W.*, 341 F.3d at 238; *see also Hafer v. Melo*, 502 U.S. 21, 25 (1991); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70-71 (1989). Additionally, the United States Court of Appeals for the Third Circuit has held that, where a claim is filed against state officials who were not directly involved in the activities that caused the alleged constitutional violation, but are instead named as defendants because of their positions in state government, they are deemed to be sued in their official capacities and thus entitled to Eleventh Amendment immunity. *Downey v. Pa. Dep't of Corr.*, 968 F.3d 299, 310 (3d Cir. 2020). As the Commonwealth has not waived its Eleventh Amendment immunity for lawsuits filed in federal court, *see* 42 Pa.C.S. § 8521, it and its departments, as well as their officials sued in their official capacities, are immune from suits filed in federal court that seek damages.

## B.    Claims Against Uninvolved Individuals and Unattributed Claims

While Craig lists as Defendants Patrick Judge, Michael Palmerchuck, and Jacob Smith as Defendants, he asserts no substantive allegations against these individuals.[9] Also, he alleges he was denied unspecified non-religious books and magazines because they were placed on a

---

[9]    Smith is identified as a Unit Manager who is assigned to the RHU. Compl. at 2, 6, 8. The only other allegation about Smith is he was the Unit Manager at a time that Craig was denied access to the law library. *Id*. at 10. But there is no allegation that Smith personally acted to deny Craig access to the law library. Judge and Palmerchuck are identified as "low level management." *Id*. at 1. There are no substantive allegations concerning Judge or Palmerchuck.

Denied Publication List or otherwise, but he fails to attribute the denial of these unspecified

books to any particular Defendant.

"A defendant in a civil rights action must have personal involvement in the alleged

wrongs" to be liable. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). *See also Iqbal*,

556 U.S. at 676 (explaining that "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits,

a plaintiff must plead that each Government-official defendant, through the official's own

individual actions, has violated the Constitution"); *Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir.

2020) ("Personal involvement requires particular 'allegations of personal direction or of actual

knowledge and acquiescence.'" (quoting *Rode*, 845 F.2d at 1207)); *Jutrowski v. Twp. of*

*Riverdale*, 904 F.3d 280, 290 (3d Cir. 2018) ("Each Government official, his or her title

notwithstanding, is only liable for his or her *own* misconduct.") (quoting *Iqbal*, 556 U.S. at 677)

(emphasis in original).  Because Craig does not allege how each of these individuals was

personally involved in a violation of his constitutional rights, they will be dismissed with

prejudice.  Claims not attributed to a named Defendant involving unspecified books and

magazines will also be dismissed for lack of personal involvement by a named Defendant.

### C.    First Amendment Claims

Craig asserts Free Exercise Clause claims against Bauer because Bauer barred him from

participating in Shabbat services, religious study classes, and holiday celebrations for fifteen

months; introduced Reconstructionist prayer books, advocated transgenderism, and pronouns

that did not conform with Craig's religious views; and failed to be present to conduct Chanukah

services.  He asserts claims against Torres because, as Bauer's supervisor, it was his policy to

permit chaplains to deny anyone religious services based on conduct that made the chaplain

uncomfortable, and because he notified his own supervisors of Craig's ban from participating in

religious activities; he made the sign of the cross in Craig's presence, compared him to a Southern Baptist, told him to keep his religion to himself, and spoke to him dismissively when Craig confronted him about the ban; and in his role as a grievance officer, demonstrated open hostility to him based on his Orthodox beliefs. Chaplain Sabir allegedly violated Craig's rights because he notified Craig on July 21 of his ban and told guards on his housing unit to deny any request he made to attend religious activities. Chaplain Comick is named because he was present when Torres disrespected Craig's religious beliefs. He also brings claims against Defendant Valdez for allegedly refusing to permit Craig to attend services on July 21 and July 25, 2023, and creating a flyer with his picture and the directive to deny him access to religious services; Defendant Wanamaker for refusing to move where the flyer was posted; and Defendant Beatty for denying Craig permission to attend religious service on August 18, 2023.[10]

### 1.      The *Turner* Test

The Supreme Court has recognized that the First Amendment guarantees that all prisoners must be afforded reasonable opportunities to exercise their religious freedom. *Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972); *see also O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987) ("Inmates clearly retain protections afforded by the First Amendment, . . . including its directive that no law shall prohibit the free exercise of religion." (citations omitted)). Specific to the prison context, although inmates retain certain protections afforded by the First Amendment, "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *O'Lone*, 482 U.S. at 348 (quotations omitted); *see also DeHart v. Horn*, 227 F.3d 47, 50-51 (3d Cir. 2000)

---

[10]      Craig does not allege the personal involvement of any other named Defendant in connection to his First Amendment claims. They will, accordingly, be dismissed against the other Defendants. *See Rode*, 845 F.2d at 1207.

("[T]he fact of incarceration and the valid penological objectives of deterrence of crime, rehabilitation of prisoners, and institutional security justify limitations on the exercise of constitutional rights by inmates." (citing *Pell v. Procunier*, 417 U.S. 817, 822-23 (1974))). While the federal courts must take cognizance of valid constitutional claims of prison inmates, the Supreme Court repeatedly has cautioned that the task of prison administration has been committed to the responsibility of the legislative and executive branches of government and federal courts should be reluctant to second-guess these authorities. *See, e.g.*, *Turner v. Safley*, 482 U.S. 78, 84 (1987); *O'Lone*, 482 U.S. at 353. Only beliefs that are (1) sincerely held, and (2) religious in nature are entitled to constitutional protection. *See DeHart*, 227 F.3d at 51. If a prisoner-plaintiff alleges plausibly that he has a sincerely held religious belief, he must also allege plausibly that the challenged prison practice or policy that allegedly infringes on his religious belief is not reasonably related to penological interests under the factors set forth in *Turner*. *DeHart*, 227 F.3d at 51.

In *Turner*, the Supreme Court held that a prison regulation that "impinges on inmates' constitutional rights" is "valid if it is reasonably related to legitimate penological interests." *Id.*, 482 U.S. at 89. A four-part test applies for assessing the overall reasonableness of the regulation: (1) whether the regulation or practice bears a "valid, rational connection" to a legitimate and neutral governmental objective; (2) whether prisoners have alternative ways of exercising the circumscribed right; (3) "[what] impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether alternatives exist that fully accommodate the prisoner's rights at *de minimis* cost to valid penological interests. *Id.* at 89-90. The absence of *de minimis* cost alternatives can support the reasonableness of the action taken by prison officials. *Id*. at 91.

The United States Court of Appeals for the Third Circuit has noted that the first factor is particularly important as "it tends to encompass the remaining factors, and some of its criteria are apparently necessary conditions." *Waterman v. Farmer*, 183 F.3d 208, 214 (3d Cir. 1999) (quoting *Amatel v. Reno*, 156 F.3d 192, 196 (D.C. Cir. 1998)).

The Commonwealth Defendants and Bauer argue that Craig's constitutional claims must be dismissed citing *Turner* and *Allah v. Al-Hafeez*, 208 F. Supp. 2d 520 (E.D. Pa. 2002). *See* Commonwealth Defs' Mem., ECF No. 32, at 11-12; Bauer Mem., ECF No. 34, at 7. In *Allah*, the court dismissed Free Exercise claims by an inmate who disagreed with a prison chaplain's teachings stating that, while the inmate did not raise his voice or stand when he interrupted a service, in a prison setting "avoiding conflict is critical to maintaining order as well as a safe environment." 208 F. Supp. 2d at 529. The prisoner was barred from religious services "until further notice," although prison officials did permit him to attend "meetings" as well as services "as long as he is able to conduct himself in accordance with our rules during Services." *Id*. at 523. The decision to bar the prisoner from religious services was held to be rationally related to the governmental interest in maintaining order and security inside the prison. *Id*. at 529.

The Commonwealth Defendants and Bauer argue that, similar to the situation in *Allah*, they had a legitimate and neutral governmental objective in barring Craig from attending group religious activities because of the numerous instances when he disrupted Defendant Bauer during the course of services and study sessions. They cite the need to avoid conflict to support Craig's prohibition from attending group religious activities. *See* ECF No. 32 at 12-13; ECF No. 34 at 2-3, 11. They contend that the second *Turner* factor also supports the ban since Craig was not prevented from practicing his religion in alternative ways, such as praying and studying with other inmates who share his Orthodox Judaism outside of Defendant Bauer's Reconstructionist

18

services.  *See* ECF No. 32 at 12-13; ECF No. 34 at 9.  On the third *Turner* factor, they again look to *Allah*, where the court held that if an inmate's behavior created a security concern requiring prison officials to expend resources to monitor the religious service more closely, the effect on prison staff and inmates would favor the ban.  *Id.* (citing *Allah*, 208 F. Supp. 2d at 530).  They argue that, had Craig been permitted to continue to attend Bauer's services and study sessions, additional prison resources have had to be expended to monitor him.  Finally, on the fourth *Turner* factor, the Commonwealth Defendants argue that there was no readily available *de minimis* cost alternative to Craig's ban.  While Craig sought to have the ban lifted and made a Request to Staff that he be provided with individual chaplaincy services from Bauer (Compl. at 6), they argue that this alternative would have created renewed disagreements with Bauer and required officials to expend additional resources to provide security and maintain order and safety.  *Id.* at 14.

Craig responds that the ban on his attending group religious activities cannot be constitutional since DOC's policy, specifically DC-ADM 819 Religious Activities Policy and Procedures Manual, states that it is DOC policy to accommodate inmates' religious beliefs "consistent with the security needs and orderly administration of the facility by providing for the orderly management of religious opportunities for all inmates."  Pl. Resp., ECF No. 48, at 49-50 (quoting DC-ADM 819); *see also* DC-ADM 819, "Religious Activities," Pa. Department of Corrections Policy and Procedures Manual (effective December 13, 2023), https://perma.cc/TU3U-9CHV (last visited March 10, 2025).[11]  He asserts that the

---

[11]    DC-ADM 819 provides:  "It is the policy of the Department to accommodate inmates' religious beliefs consistent with the security needs and orderly administration of the facility by providing for the orderly management of religious opportunities for all inmates under the Department's jurisdiction."  *Id.* at § III.  It provides further that "This policy does not create rights in any person nor should it be interpreted or applied in such a manner as to abridge the

Commonwealth Defendants "attempt to utilize [*Turner*] in a novel and unconvincing manner, expanding its findings to the point of utter absurdity." Pl. Resp. at 48. Regarding the first *Turner* factor, he argues that "it would be irrational to assume that (1) PADOC policies are expertly drafted to facilitate and effectuate [ ] legitimate penological interests, while at the same time (2) PADOC has some sort of legitimate penological interests best served by allowing employees to arbitrarily and capriciously violated the very policies that we are to assume best embodies PADOC's legitimate interests." *Id*. at 49. Regarding the fourth *Turner* factor, *de minimis* cost alternatives, Craig argues in circular fashion that, if he can point to an alternative that accommodates his rights at *de minimis* cost, "a court may consider that ready alternative as evidence that the regulation does not satisfy the reasonable relationship standard. So should there be [a *de minimis* cost alternative] that would both satisfy the legitimate penological interests of PADOC and preserve/protect the Constitutional rights of Ruben Craig . . . then defendants are required to adopt such an alternative, and the fact that they did not proves that their impinging conduct lacks a reasonable relationship to any legitimate penological interests of the PADOC."[12] *Id*. at 50.

### 2.    Ban on Participation in Group Religious Events

The Court concludes that Craig's free exercise claims based on his ban from participating in Shabbat services, religious study classes, and holiday celebrations for fifteen months are not plausible under the *Turner* test against the Commonwealth Defendants and Bauer. Craig

---

rights of any individual. This policy should be interpreted to have sufficient flexibility to be consistent with law and to permit the accomplishment of the purpose(s) of the policies of the Department of Corrections." *Id*. at § VI.

[12]    While the Commonwealth Defendants appear to assert that Craig requested individual chaplaincy services, he does not mention this alternative in his argument.

admittedly disrupted Defendant Bauer during the course of services and study sessions over differences in religious teachings Compl. at 2; ASC at 3-4; ECF 32 at 12; ECF 34 at 2, 9. Craig concedes that he disagrees with Defendant Bauer's teachings on issues of faith, and that he made comments about Bauer's discussion of transgenderism and queer theory during two study sessions, objected to his use of Reconstructionist prayerbooks, would not participate in a discussion of preferred pronouns during a session, and interrupted a Shabbat service in a manner that Bauer found offensive and interpreted as antisemitic, leading to the imposition of the ban. Because Defendants' ban on Craig's attending organized religious activities had a valid, rational connection to their legitimate and neutral objective of avoiding conflict and disruption during Bauer's organized religious activities, the free exercise claim is not plausible. Contrary to Craig's argument that the Commonwealth Defendants violated DC-ADM 819 in imposing the ban, the policy charges prison officials with providing religious services to all inmates "consistent with the security needs and orderly administration of the facility" through the "orderly management of religious opportunities for all inmates." *Id.* Their decision to ban Craig enforced this policy to avoid Craig's conceded disrupting of other inmates' ability to practice their faith.

Prison officials also argue that Craig has alternative ways of exercising his faith through private prayer and unorganized activities that do not involve Bauer. Craig responds that denial of communal prayer and one-on-one chaplaincy services meant that Bauer foreclosed all non-solitary forms of worship, "constituting a substantial burden indeed, for an adherent of a religion that requires group study and prayer, and which even has certain standard prayers – like Mourner's Kaddish – that may only be performed in groups." Resp. at 9. This allegation is not

in the Complaint; also, Craig's argument misstates the nature of the ban since performing

Kaddish or other prayers outside of Bauer's organized activities are not included in the ban.

Prison officials also argue, with no response by Craig, that his disruptions of Bauer's

activities impacted prison resources, and that an alternative in the form of individual chaplaincy

services could not be provided at *de minimis* cost since Bauer was the only Jewish chaplain at

SCIP and his fraught relationship with Bauer would only continue in one-on-one sessions.

While Craig addresses the fourth *Turner* factor, he fails to suggest that a *de minimis* alternative

to the ban existed.

Accordingly, the Motion to Dismiss the Free Exercise Clause claims will be granted as

to Defendants Bauer, Sabir, Valdez, and Beatty, all of whom were alleged to have violated

Craig's rights by denying him access to religious services; and as to Defendant Torres based

upon his alleged role in creating or applying a policy to permit chaplains to deny religious

services. *Allen v. Eckard*, 804 F. App'x 123, 127 (3d Cir. 2020) (*per curiam*) (concluding that a

supervisory liability claim was meritless where the plaintiff failed to make a plausible showing

of an underlying constitutional violation).

### 3.    Other Claims Against Torres and Chaplain Comick

Additionally, to the extent Craig asserts a free exercise claim against Torres because he

demonstrated hostility, made the sign of the cross in Craig's presence, compared him to a

Southern Baptist, told him to keep his religion to himself, and spoke to him dismissively when

Craig confronted him about the ban, the claim is dismissed.  Verbal abuse or taunts, without

more, are insufficient to violate the Constitution.  *See Ayala v. Terhune*, 195 F. App'x 87, 92 (3d

Cir. 2006) (*per curiam*) ("[A]llegations of verbal abuse, no matter how deplorable, do not

present actionable claims under § 1983."); *DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000)

("Standing alone, simple verbal harassment does not constitute cruel and unusual punishment, deprive a prisoner of a protected liberty interest or deny a prisoner equal protection of the laws."). Also, to the extent Craig asserts a claim against Torres based on his role as a grievance officer, the claim is not plausible because prisoners have no constitutional right to a grievance process. *Gerholt v. Wetzel*, 858 F. App'x 32, 34 (3d Cir. 2021) (*per curiam*) (citing *Massey v. Helman*, 259 F.3d 641, 647 (7th Cir. 2001) and *Flick v. Alba*, 932 F.2d 728, 729 (8th Cir. 1991) (*per curiam*)). Finally, (1) the claim against Chaplain Comick because he was merely present when Torres allegedly disrespected Craig's religious beliefs, and (2) the claim against Defendant Wanamaker for refusing to move where a flyer was posted, will be dismissed since they do not allege a violation of Craig's free exercise rights or otherwise state a plausible constitutional claim.

### 4.    Failure to Conduct Chanukah Service

Bauer also seeks dismissal of Craig's Free Exercise Clause claim based on Bauer not personally conducting Chanukah services. ECF No. 34 at 7. This claim will be dismissed. The United States Supreme Court has held that "[a] special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand." *Cruz*, 405 U.S. at 322 n. 2 (*per curiam*); *see also Gittlemacker v. Prasse*, 428 F.2d 1, 4 (3d Cir. 1970) (holding that there is no affirmative duty to provide an inmate with a clergyman of his choice); *Garraway v. Lappin*, 490 F. App'x 440, 445 (3d Cir. 2012) (same); *Weir v. Nix*, 114 F.3d 817, 820-21 (8th Cir. 1997) ("The Constitution does not, however, require that a religious advisor be provided for every sect in a penitentiary. Nor is a prisoner entitled to insist on a religious advisor whose beliefs are completely congruent with [her] own." (citations omitted)). Because Craig had no First Amendment right to have a

clergyman provided, he cannot base a claim on Bauer's failure to conduct a particular holiday service. Moreover, he concedes that Bauer's presence was not needed to celebrate the holiday. Thus, he cannot plausibly claim that his free exercise rights were infringed by Bauer's absence on Chanukah or the failure of other Defendants to provide substitute staff on that holiday.

###### 5.    Claims Against Bauer Based on Doctrinal Disagreements

Craig may also be asserting an Establishment Clause claim based on his assertions that Bauer introduced Reconstructionist prayer books, and advocated transgenderism and the use of pronouns that did not conform with Craig's religious views. *See* Resp. at 10 ("The defendants' actions denied Mr. Craig a tolerant, neutral environment to exercise the free expression of his religious beliefs, subjecting him to bias and open hostility due to said beliefs.") (citing Compl. Count 2 (alleging that Defendants Torres's policy to permit his chaplains to deny anyone religious services) and 10 (alleging that Torres made the sign of the cross and demonstrated hostility toward Orthodox Jewish views), ECF No. 2 at 2-3 5); *see also id.* at 63 (challenging whether that the Defendants' need to prevent conflict "is so critical that a chaplain can and must be permitted to define what is orthodox and permissible for one to believe, and he/she must be able to take action against any deviation from this norm."). This claim is also dismissed.

While Bauer cites to the test of *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971) (holding that state action must satisfy three conditions to avoid violating the Establishment Clause: it "must have a secular legislative purpose," "its principal or primary effect must be one that neither advances nor inhibits religion," and it "must not foster 'an excessive government entanglement with religion'"), *see* ECF No. 34-1 at 11, which was formerly the central framework for Establishment Clause challenges, it is no longer the applicable test in the prison context or otherwise, since the Supreme Court has "instructed that the Establishment Clause

Case 2:23-cv-03608-JFL    Document 61    Filed 03/11/25    Page 25 of 49


must [instead] be interpreted by 'reference to historical practices and understandings.'" *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 535 (2022) (quoting *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014)). Under either test, any Establishment Clause claim based on Bauer's introduction of Reconstructionist prayer books, and discussing transgenderism and the use of pronouns is not plausible. Craig does not allege that the use of certain texts or the discussion of certain topics during services and study sessions violated historic institutional practices of providing religious services to prisoners. Neither could the use of particular texts and discussion of particular topics in group settings to, as Craig alleges, "define what is orthodox and permissible for one to believe," be the basis of an Establishment Clause claim since there is no suggestion that Craig was forced to attend Bauer's sessions, accept his teachings as Orthodoxy, or prohibited from individually practicing his religion according to his own precepts. *Turner*, 482 U.S. at 89-90; *see e.g., Bobko v. Lavan*, 157 F. App'x 516, 518 (3d Cir. 2005) (*per curiam*) ("The government violates the First Amendment's Establishment Clause when it requires a prisoner to participate in a drug or alcohol rehabilitation program with a religious component.").

### 6.    Disposal Of Sacred Texts

Craig's claim in the ASC concerning Bauer's allegedly improper disposal of sacred texts, *see* ADC at 5, is also dismissed. Craig's clam is based on Section 3A, ¶ 12c of DC-ADM 819, which provides that sacred texts that are no longer usable "shall be given to the FCPD/Faith Group Leader for appropriate disposal as deemed acceptable by that faith tradition." *See* DC-ADM 819. Accepting as true that Bauer or other prison officials failed to follow this regulation,

that failure does not state a plausible constitutional claim.[13]  "As many courts have held, corrections officials cannot be held liable for failing to conform to procedures outlined in inmate handbooks and other internal prison procedures."  *Bowman v. Wetzel*, No. 20-135, 2020 WL 3258946, at *6 (W.D. Pa. June 16, 2020) (citing cases); *see also Curry v. McCann*, No. 18-5444, 2019 WL 77441, at *7 (E.D. Pa. Jan. 2, 2019) ("Even if Curry was asserting a claim against C.O. McCann based on this questioning, 'a prison's departure from the policies and procedures outlined in the facility's handbook does not, in and of itself, amount to a constitutional violation actionable under § 1983.'") (citing *Laufgas v. Speziale*, No. 04-1697, 2006 WL 2528009, at *7 n.7 (D.N.J. Aug. 31, 2006)).

The claim is also not plausible under the *Turner* test.  While Craig appears to assert that any material that contains the four-letter name of his deity is a "sacred text," he does not otherwise describe the materials, particularly whether they were officially sanctioned materials. Notably, DC-ADM 819 provides that "homemade or other unauthorized sacred objects are not permitted and shall be confiscated."  It also provides, alternatively, that an inmate "can elect to send the unauthorized object(s) home at his/her expense or the sacred object(s) will be destroyed."  DC-ADM 819, § 3A1, ¶ J.  Craig does not allege that a clergy member was required to dispose of the material or why he could not utilize the alternate disposal method of sending the material home in order to observe his religious obligation.

---

[13]    Craig allegation about American flag patches on uniforms also fails to allege a plausible claim since he does not allege that they are his objects and his belief that they may be improperly disposed is mere speculation.

**D.      Denial of Secular Books**

**1.      Due Process Claims**

Craig alleges a due process violation based on the prison mailroom refusing to deliver

two books he had ordered, "Mechatronics For the Evil Genius" and "Complete Guide to

Sniping."  *Id*. at 12; ASC at 11.  Defendant Mailroom Supervisor Long allegedly falsified an

Incoming Publication Review Committee ("IPRC") denial form for the first book, which Craig

claims is a middle school/high school level book about robotics.  Compl. at 12.  The crux of his

due process claim is that Long told Craig that the IPRC consisted of himself, CO Dusch, and

Librarian Ephriam, but Ephriam allegedly told Craig he had not been on the IPRC for five years

and had no knowledge of the book.  *Id.*

The Commonwealth argues that the due process claim involving these books is not

plausible because Craig had no protected property interest in receiving these books, the prison

had a reasonable interest in reviewing incoming publications, and the prison grievance process

provided Craig with an adequate post-deprivation remedy.  Def. Mem. at 20-21.  Craig responds

that his claim is plausible because the Defendants violated their own regulation, DC-ADM 803,

governing the review and receipt of publications and photographs.[14]  Resp. at 55.  The regulation

provides that the mailroom supervisor, school principal, librarian, or other staff shall forward

suspect publications to the IPRC, which "must include at least three facility personnel selected

by the Facility Manager/designee [including] one member from the Education Department

(Librarian, Teacher, or School Principle), one member from the Facility Security Office, and the

Mailroom Supervisor."  *Id*. (quoting DC-ADM 803, § 2.D.1, at 2-4). Craig argues that Defendant

---

[14]      The regulation is available at DC-ADM 803, "Inmate Mail and Incoming Publications,"
Pa. Department of Corrections Policy and Procedures Manual (effective August 10, 2020),
https://perma.cc/D78Q-928K (last visited March 10, 2025).

Long violated the regulation when she did not convene the IPRC but denied the books "on her own." *Id.*

Craig argues that any assertion that he was denied the robotics book and the sniping book because their subject matters posed a threat to institutional security should be rejected since the DOC "readily accepts publications including the very same information that this screener found objectionable." *Id.* at 56. He argues his claim is plausible because Long denied the robotics book feeling it posed a threat to security, while the prison library contains books about electronics and transformers; and she denied the sniping book even though its publisher's magazine, *Guns and Ammo*, and other books about ballistics and long guns are permitted in DOC institutions. *Id.* He concludes that Long denied the books based on personal prejudice rather than institutional security. *Id.*

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. To state a claim under § 1983 for a violation of one's procedural due process rights, "a plaintiff must allege that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to him did not provide 'due process of law.'" *Hill v. Borough of Kutztown*, 455 F.3d 225, 233-34 (3d Cir. 2006).

The procedural aspect of the Due Process Clause guarantees the availability of certain procedural mechanisms, typically the right to notice and a hearing before the government can deprive an individual of a liberty or property interest. To establish a procedural due process violation, a person must first demonstrate that he has been deprived of a constitutionally protected property or liberty interest. *Renchenski v. Williams,* 622 F.3d 315, 325 (3d Cir. 2010).

28

"A prisoner may be deprived of a liberty interest in violation of the Constitution in two ways: (1) when severe changes in conditions of confinement amount to a grievous loss that should not be imposed without the opportunity for notice and an adequate hearing, . . . and (2) when state statutes and regulations create a liberty interest in freedom from restraint that imposes an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life[,]' thereby triggering due process protection." *Id*. (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995), other internal citations omitted); *see also Griffin v. Vaughn*, 112 F.3d 703, 706 (3d Cir. 1997) ("In the prison context, "[d]ue process protection for a state created liberty interest is . . . limited to those situations where deprivation of that interest 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" (quoting *Sandin*)).

Craig's due process claims involving the robotics and sniping books are dismissed. First, accepting as true that Defendant Long failed to follow the procedures in DC-ADM 803, this is insufficient in itself to allege a plausible due process claim. *Bowman*, 2020 WL 3258946, at *6; *Curry*, 2019 WL 77441, at *7. Second, being denied books about robotics and sniping does not amount to an atypical and significant hardship in relation to the ordinary incidents of prison life as discussed in *Sandin*. *Accord Crosby v. Ozmint*, No. 12-440, 2013 WL 5306052, at *4 (D.S.C. Sept. 18, 2013) (noting that *Sandin* indicated that "the search for a negative implication from mandatory language in prisoner regulations has strayed from the real concerns undergirding the liberty protected by the Due Process Clause," (citation omitted) and stating that "Plaintiff was denied access to a book after the CRS determined it was prohibited by Section 20.1.6 of SCDC Policy No. PS-10.08. The Court does not find that being denied a book amounts to an atypical and significant hardship in relation to the ordinary incidents of prison life as discussed in *Sandin*.").

2.      **First Amendment Claim**

According to Craig, a third book "Lighting the Nude," is on a Denied Publication List, he was not approved to receive it, and the book was confiscated in violation of his First Amendment rights. Craig's claim involving "Lighting the Nude" is dismissed because he failed to allege in the Complaint or ASC which named Defendant, if any, violated his rights by putting the title on the list of prohibited books or by refusing to permit him to order it. *See Rode*, 845 F.2d at 1207 (to be plausible, a plaintiff must allege the personal involvement of the defendant in the civil rights violation). Even if he had done so, the claim would not be plausible and thus, no opportunity for amendment will be afforded.

"Inmates have a First Amendment right to receive information while in prison to the extent the right is not inconsistent with prisoner status or the legitimate penological objectives of the prison." *Jacklovich v. Simmons*, 392 F.3d 420, 426 (10th Cir. 2004). Regulations affecting prisoners' access to publications are valid in terms of the First Amendment if they are reasonably related to legitimate penological interests. *See Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989) (citing *Turner*, 482 U.S. at 89). Thus, regulations that should be viewed with caution include those which categorically prohibit access to a broad range of materials. *See Keenan v. Hall*, 83 F.3d 1083, 1093 (9th Cir. 1996), *amended*, 135 F.3d 1318 (9th Cir. 1998) (allowing challenge to prison's "publisher's only" rule that applied to soft-cover books); *see also Johnson v. Moore*, 948 F.2d 517, 520 (9th Cir. 1991) (rule categorically preventing inmates from receiving soft-cover books and magazines not sent directly from publisher must be scrutinized closely). At issue in *Thornburg* was a federal Bureau of Prisons regulation that allowed the prison warden to reject outside publications mailed to a prisoner if the publication was deemed to be detrimental to the "security, good order, or discipline of the institution or if it might facilitate criminal

30

activity."  490 U.S. at 403 n.1.  The regulations in that case did not permit the rejection of a

publication "solely because its content is religious, philosophical, political, social or sexual, or

because its content is unpopular or repugnant."  *Id.* at 405.  Rather, each issue had to be reviewed

separately and, if the warden rejected a publication, he was required to immediately notify the

inmate in writing of the rejection and the reasons therefor, including a reference to the specific

part of the publication deemed objectionable.  *Id.*

        Under *Thornburg*, courts generally apply the *Turner* four-factor test to determine whether

the restriction on a book is reasonably related to legitimate penological interests.  *Id.*; *Beerheide*

*v. Suthers*, 286 F.3d 1179, 1185 (10th Cir. 2002) (citing *Turner*, 482 U.S. at 89-91).  The

Commonwealth Defendants cite *Thornburg* to argue that they have a reasonable interest in

reviewing incoming publications, especially publications like "Lighting the Nude" that contain

nudity.  Def. Mem. at 20 (citing *Thornburg*, 490 U.S. at 416 and *Dubar v. Wetzel*, No. 484 M.D.

2018, 2019 WL 2997467, at *4 (Pa. Commw. Ct. July 10, 2019)); *see also Key v. Dep't. of*

*Corr.*, 185 A.3d 421 (Pa. Commw. Ct. 2018).  Craig responds that nude photography "is a

legitimate art form; therefore a book teaching how to set up lighting for nude compositions is

both artistic and educational.  However, despite qualifying for both the educational and artistic

exception under the DC-ADM 803, [his] book was denied."  Resp. at 54.

        While not binding on this Court, in *Key* the Pennsylvania Commonwealth Court rejected

the prisoner-plaintiff's assertion that the ban on books containing *nudity* in the then-applicable

version of DC-ADM 803 was invalid because it conflicted with the definition of *obscenity* in the

Pennsylvania Crimes Code, 18 Pa.C.S. § 5903.  The Court held that, "[g]iven that inmates'

constitutionally [ ] protected rights may be subject to greater restrictions than those of the general

public, we agree . . . that simply because [DC-ADM 803] is more restrictive than the [Criminal]

Obscenity [Statute], [DC-ADM 803] is not unconstitutionally over restrictive.  This is
particularly so where our Supreme Court has twice held that [DC-ADM 803], or its predecessors,
were reasonably related to legitimate penological interests." *Key,* 185 A.3d at 424 (citing
*Brittain v. Beard*, 974 A.2d 479, 488 (Pa. 2009) ("where the Department advanced legitimate
penological interests supporting its anti-pornography policy, and Brittain did not raise a genuine
issue of material fact as to the unreasonableness of the Department's belief that its policy
furthers such interests, Brittain has not met *Turner's* high standard."); *Payne v. Dep't of Corr.*,
871 A.2d 795, 811 (Pa. 2005) (DC-ADM 803's "underlying objectives of security and
rehabilitation are legitimate and neutral government interests").

No leave to amend the First Amendment claim regarding "Lighting the Nude" will be
afforded because courts have found that the DOC has legitimate penological interests supporting
its ban on books containing nudity and Craig does not allege facts to support an inference that
the policy is unreasonable, that he has no alternate way to create or appreciate art without access
to the book, that there is no impact on correctional resources, or that there is not more than a *de
minimis* cost involved. *Turner,* 482 U.S. at 89-90.  In other words, given the long line of
precedents about prison officials' legitimate penological interests in banning books containing
nudity, any attempt to amend the claim involving "Lighting the Nude" would be futile. *Grayson
v. Mayview State Hosp.*, 293 F.3d 103, 108, 110 (3d Cir. 2002) (district courts should dismiss
complaints under the PLRA with leave to amend "unless amendment would be inequitable or
futile.").

### E.    RLUIPA Claims

Craig also asserts claims for injunctive relief under the RLUIPA based on his being
barred from participating in group religious activities at SCIP.  He names Defendants Olinger,

Sipple, John Muick, Derek White, Charles Hensley, Terra, Laurel Harry, Adrianna Rudolph, and a John Doe on this claim. Compl. at 6-8. He seeks injunctive relief under the Act to remove restrictions on his access to religious activities.[15] *Id*. at 8. Craig, however, is no longer housed at SCIP where the fifteen-month ban on his participation in organized religious activities was imposed, and the ban was due to expire while the Defendants' motions were pending. The Court thus required the parties to file supplemental briefs addressed to whether the RLUIPA claims remained viable, ECF No. 53, and the Court has received those submissions, ECF Nos. 54-56.

The RLUIPA claim is dismissed as moot. Under Article III of the Constitution, federal courts will only have jurisdiction over a matter where there is a live case or controversy to be resolved. *See*, *e.g.*, *Spencer v. Kemna*, 523 U.S. 1, 7 (1998). The "case or controversy" requirement "'subsists through all stages of federal judicial proceedings [and for jurisdiction to exist the] parties must continue to have a 'personal stake in the outcome of the lawsuit.'" *Id*. (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477-78 (1990)). Thus, where a plaintiff no

---

[15]     As with his First Amendment claims, Craig appears to assert his RLUIPA claims against the Defendants in their individual and official capacities and also seeks money damages. Damages are not available against states or their officials acting in their official capacities under the RLUIPA. *See Sossamon v. Texas*, 563 U.S. 277, 293 (2011) ("We conclude that States, in accepting federal funding, do not consent to waive their sovereign immunity to private suits for money damages under RLUIPA because no statute expressly and unequivocally includes such a waiver."). The Act, however, does permit a plaintiff to "obtain appropriate relief against a government." *Sharp v. Johnson*, 669 F.3d 144, 153 (3d Cir. 2012) (citing 42 U.S.C. § 2000cc-2). The statute defines "government" to include state entities, their agencies, and any other person acting under color of state law. *See id*. (citing 42 U.S.C. § 2000cc-5(4)(A)). Thus, RLUIPA applies to state employees acting in their official capacities, but not their individual capacities. *See id.*; *Mack v. Warden Loretto FCI*, 839 F.3d 286, 303 (3d Cir. 2016) ("[S]tate officials . . . cannot be held individually liable under RLUIPA"); *Spada v. Klemm*, No. 22-478, 2023 WL 2290258, at *6 (M.D. Pa. Feb. 28, 2023) ("RLUIPA does not permit an action against state officials in their individual capacities."). Because the RLUIPA does not provide a basis for claims against individual officials in their individual capacities or for money damages, *Sharp*, 669 F.3d at 154, these RLUIPA claims will be dismissed.

longer has a personal stake in the outcome of a claim or case, his claim will become moot and must be dismissed as such.  *Id.*

Because RLUIPA does not permit the recovery of money damages against individual defendants, and Craig can no longer receive injunctive relief as (1) he has been transferred from SCIP, (2) the fifteen-month ban on his participation in group religious activities has expired, and (3) there is no suggestion that he is unable to engage in group religious activities at SCI Benner. The RLUIPA claims are therefore moot.  *See, e.g.*, *Banks v. Sec'y Pa. Dep't of Corr.*, 601 F. App'x 101, 103-04 (3d Cir. 2015) ("[T]o the extent that Banks seeks that relief against defendants at SCI-Retreat, his claims are moot because he was transferred to SCI-Somerset"). Because the ban was imposed due to specific past conduct and there is also no suggestion that Craig will be incarcerated at SCIP in future, his case not does not present an issue capable of repetition, yet evading review.[16]  *Id.* (citing *Jordan v. Sosa*, 654 F.3d 1012, 1025 (10th Cir. 2011).  To the extent Craig bring any other claims for injunctive relief, those claims are also moot for the same reasons.

### F.     Law Library Access

Craig asserts that he was denied access to the prison law library (1) by CO Alison Grenon because his shirt was allegedly untucked even though he told an unnamed correctional officer who was Grenon's superior that he had to meet a deadline; (2) by Defendant Cloninger after he questioned her about a DOC policy about access to the law library, requested a grievance form and she refused to provide one; when she charged him for overdue books; and when she wrote a misconduct accusing him of possessing contraband and tampering with prison property; (3) by

---

[16]     Also pending is a motion filed by Craig, *see* ECF No. 56, to file an amended complaint. In that motion, Craig seeks to add one named and one John Doe defendant to his RLUIPA claim. As the RLUIPA claim is moot, the motion will be denied in the accompanying Order.

Defendant David Medina who removed him from the law library because he did not like that Craig wrote down the number of a DOC policy and mentioned that he saw Medina asleep; and (4) by Defendants Ephraim and Cloninger when they closed the SCIP eastside library for extended periods over the holiday season.  The Commonwealth Defendant argue that none of these claims are plausible because Craig fails to allege that he suffered any actual injury from having his access to the law library limited.  ECF No. 32 at 18-19.

Prisoners maintain a "fundamental constitutional right of access to the courts," embodied in the First and Fourteenth Amendments.  *Lewis v. Casey*, 518 U.S. 343, 346 (1996) (quoting *Bounds v. Smith*, 430 U.S. 817, 828 (1977)); *see Monroe v. Beard*, 536 F.3d 198, 205 (3d Cir. 2008) ("Under the First and Fourteenth Amendments, prisoners retain a right of access to the courts.").  Meaningful access to the courts is the touchstone, and there is no "abstract, freestanding right to a law library or legal assistance" unmoored from the need to access the courts  *Lewis*, 518 U.S. at 351.  Convicted prisoners like Craig "may only proceed on access-to-courts claims in two types of cases, challenges (direct or collateral) to their sentences and conditions of confinement."  *Monroe*, 536 F.3d at 205; *Shane v. Fauver*, 209 F. App'x 87, 89 (3d Cir. 2006) (*per curiam*) ("[T]he actual injury requirement is not met by every type of frustrated legal claim; constitutional protections are applied only to a prisoner's direct or collateral attack on his or her sentence, or challenges to prison conditions"); *see also Lewis*, 518 U.S. at 355 (the inability to litigate claims other than an attack on a sentence or conditions of confinements "is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration").

"A prisoner making an access-to-the-courts claim is required to show that the denial of access caused actual injury."  *Jackson v. Whalen*, 568 F. App'x 85, 87 (3d Cir. 2014) (*per*

*curiam*) (quoting *Lewis*, 518 U.S. at 350). This is because the right of access to the courts "rest[s] on the recognition that the right is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002). In other words, a prisoner claiming that he was denied access to the courts must allege an injury traceable to the conditions of which he complains. *Diaz v. Holder*, 532 F. App'x 61, 63 (3d Cir. 2013) (*per curiam*) (affirming dismissal of denial of access claims where plaintiff failed to tie alleged deficiencies in library to harm in underlying action). In general, an actual injury occurs when a prisoner demonstrates that a "nonfrivolous" and "arguable" claim was lost because of the denial of access to the courts. *Christopher*, 536 U.S. at 415. "[T]he underlying cause of action . . . is an element that must be described in the complaint." *Id*. Furthermore, the right to access the courts may be satisfied if the plaintiff has an attorney. *Diaz*, 532 F. App'x at 63 (citing *Bounds*, 430 U.S. at 831 and *Peterkin v. Jeffes*, 855 F.2d 1021, 1042 (3d Cir. 1988)); *see also Prater v. City of Phila.*, 542 F. App'x 135, 137 n.4 (3d Cir. 2013) (*per curiam*).

Craig fails to allege that he "lost" a non-frivolous claim concerning a direct or collateral attack on his sentence or the conditions of his confinement. Although he mentions a deadline, for none of the instances where he asserts that a Defendant impeded his access to the law library does he make any allegation about his need to use the law library, let alone that the Defendants' actions caused an actual injury. The claims concerning his access to the law library will be dismissed.

### G. Use of OC Spray

Craig also appears to assert an excessive force claim against Defendant Emminger based on his use of OC spray on September 18, 2021. Craig asserts that he was alone in his cell but

"would not speak" and Emminger used OC spray through the wicket in the cell door.  He also appears to assert claims based on Defendant Hamilton's threat to use OC spray by on November 20, 2022 when he requested to see a copy of a DOC policy, and due to his exposure to OC spray on August 25, 2023 when Defendant Green used it to control another inmate while Craig was nearby.  Compl. at 11-12.

The Eighth Amendment prohibits prison officials from unnecessarily and wantonly inflicting pain in a manner that offends contemporary standards of decency.  *See Hudson v. McMillian*, 503 U.S. 1, 8 (1992).  "Force that is used 'maliciously and sadistically for the very purpose of causing harm' violates the Eighth Amendment."  *Young v. Martin*, 801 F.3d 172, 180 (3d Cir. 2015) (quoting *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986)).  When screening an Eighth Amendment excessive force claim under § 1915, the Court asks whether the prisoner has alleged plausibly that the force was applied "maliciously and sadistically to cause harm" rather than "in a good-faith effort to maintain or restore discipline."  *Jackson v. Bueno*, No. 20-0687, 2020 WL 2847925, at *3 (E.D. Pa. June 2, 2020) (quoting *Hudson*, 503 U.S. at 7).  The factors used to determine whether the force applied was excessive include: (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response.  *Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000) (quoting *Whitley*, 475 U.S. at 321).  Although the extent of an inmate's injuries is relevant to an Eighth Amendment analysis, "there is no fixed minimum quantum of injury that a prisoner must prove that he suffered through objective or independent evidence in order to state a claim for wanton and excessive force."  *Id.* at 104.  Thus, while an injury may

inform whether the use of force was reasonable, the inquiry must be driven by the extent of the force and the circumstances in which it is applied, not by the resulting injuries. *Id.* at 108; *see also Smith v. Mensinger*, 293 F.3d 641, 648 (3d Cir. 2002).

The Eighth Amendment does not protect against a *de minimis* use of physical force, so long as it is not of a sort "repugnant to the conscience of mankind." *Brooks*, 204 F.3d at 107 (quoting *Hudson*, 503 U.S. at 9-10). Moreover, "[t]he use of chemical agents to subdue recalcitrant prisoners is not cruel and unusual when reasonably necessary." *Gibson v. Flemming*, 837 F. App'x 860, 862 (3d Cir. 2020) (quoting *Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984)); *see also Passmore v. Ianello*, 528 F. App'x 144, 147 (3d Cir. 2013) (*per curiam*) (explaining that the use of chemical agents is not a *per se* constitutional violation).

### 1. Defendant Emminger

Craig's limited allegations fail to allege plausibly that Defendant Emminger used OC spray maliciously and sadistically to cause harm, rather than in a good-faith effort to maintain or restore discipline. He alleges only that Emminger used the substance by spraying it through the wicket in the cell door when Craig refused to communicate with him. He provides no other facts to explain the context of the use of force, specifically, the nature of their interaction, why he refused to communicate with Emminger, or any circumstances that may have required Emminger to communicate with him. Nonetheless, from his limited statement of facts, Craig concedes that there was a need for the application of force – to restore discipline in the face of his otherwise unexplained recalcitrance. He has not alleged sufficient facts to make plausible an assertion that there was no relationship between the need to end his recalcitrance and the amount of force that was used. *See, e.g.*, *Jones v. Shields*, 207 F.3d 491, 496 (8th Cir. 2000) ("[L]imited application of [OC spray] to control a recalcitrant inmate constitutes 'a tempered response by prison

officials' when compared to other forms of force." (internal quotation omitted)).  He also does not allege that Emminger continued to use the substance after he had been subdued.  *Compare Voorhis v. Lindsey*, No. 23-93, 2024 WL 3862751, at *4 (W.D. Pa. July 29, 2024), *report and recommendation adopted*, 2024 WL 3861408 (W.D. Pa. Aug. 19, 2024) ("[W]hile the use of tear gas 'to subdue recalcitrant prisoners does not constitute cruel and inhumane punishment,' the use of OC spray after an inmate '[has] been restrained in handcuffs and the altercation [has] ended supports a plausible inference that force was no longer necessary.'") (quoting *Major v. Halligan*, No. 21-68, 2021 WL 6283944, at *7 (W.D. Pa. Nov. 17, 2021)).  Because Craig's allegations fail to nudge his claim over the line from conceivable to plausible, the excessive force claim against Emminger will be dismissed.  *See Doe v. New Castle Cnty.*, No. 23-3190, 2024 WL 4719143, at *1 n.1 (3d Cir. Nov. 8, 2024) ("To survive a motion to dismiss, a complaint need only "nudge[ ]" the claims "across the line from conceivable to plausible." (quoting *Iqbal*, 556 U.S. at 680 and *Twombly*, 550 U.S. at 570).

Craig will not be granted an opportunity to amend this claim for the additional reason that he failed to exhaust his prison grievance remedies.  The Prison Litigation Reform Act "mandates that prisoners exhaust internal prison grievance procedures before filing suit."  *Small v. Camden Cnty.*, 728 F.3d 265, 268 (3d Cir. 2013); see 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."); *Woodford v. Ngo*, 548 U.S. 81, 85 (2006) ("[E]xhaustion of available administrative remedies is required for any suit challenging prison conditions, not just for suits under § 1983.") (citing *Porter v. Nussle*, 534 U.S. 516, 524 (2002)).

In cases governed by the PLRA, courts must address whether the prisoner-plaintiff has substantially "complet[ed] the administrative review process in accordance with the applicable procedural rules." *Downey*, 968 F.3d at 305 (quoting *Woodford*, 548 U.S. at 85), *see also Rinaldi v. United States*, 904 F.3d 257, 265 (3d Cir. 2018); *Nyhuis v. Reno*, 204 F.3d 65, 77-78 (3d Cir. 2000) ("[C]ompliance with the administrative remedy scheme will be satisfactory if it is substantial."). These procedural rules are supplied by the individual prisons. *Jones v. Bock*, 549 U.S. 199, 218 (2007) ("[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."); *see also Smith v. Sec'y of Pa. Dep't of Corr.*, 747 F. App'x 101, 103 (3d Cir. 2018) (stating that a prisoner must complete the administrative review process in accordance with the applicable procedural rules of the grievance system at his institution); *Booth v. Churner*, 206 F.3d 289, 299 (3d Cir. 2000) (explaining that a plaintiff must follow each of the steps to exhaust his administrative remedies under the PLRA). "Just as inmates must properly exhaust administrative remedies per the prison's grievance procedures, prison officials must strictly comply with their own policies." *Downey*, 968 F.3d at 305 (citing *Shifflet v. Korszniak*, 934 F.3d 356, 367 (3d Cir. 2019) ("[W]e hold that [the PLRA] requires strict compliance by prison officials with their own policies.")).

"There is one exception to the mandatory exhaustion requirement: administrative remedies must be available to the prisoner." *Downey*, 968 F.3d at 305 (citing *Ross v. Blake*, 578 U.S. 632 (2016)). "An administrative remedy is unavailable when it 'operates as a simple dead-end[,] . . . is so opaque that it becomes, practically speaking, incapable of use, or when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.'" *Id*. (quoting *Shifflett*, 934 F.3d at 365). *See Hardy v. Shaikh*, 959 F.3d 578, 584 (3d Cir. 2020).

The Commonwealth Defendants argue that Craig did not exhaust the excessive force claim against Emminger. Def. Mem. 27-30. Attached to their motion is Grievance #946563, filed by Craig on September 18, 2021 in which he grieved that Emminger used excessive force. Craig asserted that he was using his toilet and had his window partially blocked, which he claimed was "standard and permitted" under anti-sexual harassment standards, "although technically against the rules." ECF No. 32-3 at 4. Emminger knocked on the cell door and Craig acknowledged him. *Id.* As he tried to comply with Emminger's directive to unblock his cell window, Emminger "sprayed [him] in the face with chemical spray." The grievance was denied on initial review. *Id*. at 2. The Commonwealth has provided a declaration of Rhonda House, a facility grievance coordinator, asserting that the initial review response to the grievance was delivered to Craig. Decl. of Rhonda House, ECF No. 32-1, at 2. Attached to the declaration is a spread sheet of Craig grievance activity. *Id*. at 2-12. Based on the spread sheet, House asserts that Craig filed four grievances within the month following the incident with Emminger, but only Grievance #946563 relates to an allegation of abuse. The Commonwealth argues that Craig failed to exhaust the grievance process with regard to the Emminger incident because he failed to appeal after his initial review response found his claim to be unsubstantiated. Def. Mem. at 29.

Craig does not respond to the Court's Order directing the parties to present any material that may be pertinent to the exhaustion issue.[17] Because the indisputably authentic documents

---

[17]     "[W]here a defendant moves to dismiss based on a failure-to-exhaust defense and the exhaustion issue turns on indisputably authentic documents related to the inmate's grievances, [a court] may consider those documents without converting a motion to dismiss to a motion for summary judgment." *Rinaldi v. United States*, 904 F.3d 257 261 n.1 (3d Cir. 2018) (internal quotations and alterations omitted); *Spruill v. Gillis*, 372 F.3d 218, 223 (3d Cir. 2004) ("Given that the exhaustion issue turns on the indisputably authentic documents related to Spruill's grievances, we hold that we may also consider these without converting it to a motion for summary judgment."); *Brown v. Croak*, 312 F.3d 109, 111 (3d Cir. 2002) ("In appropriate cases, failure to exhaust may be raised as the basis for a motion to dismiss."); *see, e.g., Walker v. Little,*

indicate that he has not substantially completed the administrative review process in accordance with the applicable procedural rules, *Downey*, 968 F.3d at 305, any attempt to amend the excessive force allegation against Emminger would be futile.  *Grayson*, 293 F.3d at 110.

### 2.    Defendants Hamilton and Green

The other excessive force claims involving the use of OC spray are not plausible and will be dismissed without leave to amend.  Defendant Hamilton's mere threat to use OC spray is not plausible because there is no allegation that force was actually used.  *See, e.g.*, *Chamberlain v. City of Albuquerque*, 991 F.2d 805 (10th Cir. 1993) ("The mere threat of force, while perhaps intimidating, is not excessive force."); *Cabral v. City of New York*, No. 12-4659, 2014 WL 4636433, at *11 (S.D.N.Y. Sept. 17, 2014) (collecting cases and dismissing claim based on drawing of gun stating that threats of force cannot constitute excessive force as a matter of law), *aff'd*, 662 F. App'x 11 (2d Cir. 2016).  Finally, the excessive force claim against Defendant Green, based on Craig being exposed to OC spray when it was used it to control another inmate

---

No. 22-3451, 2023 WL 2570562, at *1 (3d Cir. Mar. 20, 2023) (affirming grant of motion to dismiss based on failure to exhaust administrative remedies).  Nonetheless, the Court placed the parties on notice that the material appended by the Commonwealth would not be excluded and provided them an opportunity to present any additional material pertinent to the exhaustion issue. ECF No. 58.

Craig did not submit any materials in response to the Court's notice and his time to do so has now expired.  The Court notes, however, that Craig did addresses exhaustion in his Response, *see* ECF No. 48 at 66, where he argued that a Facility Grievance Coordinator at SCI Fayette could not have "personally deliver[ed] grievances [to him at SCIP] and she has no first-hand knowledge regarding whether or not [he] ever received the grievance responses in question" and would have "no first hand information or proof of delivery."  *Id.*  He asserts that he "was never provided any copy of the grievance in question, he did not have any tracking number to follow up on it with; he could not follow any appeal for it; and thus he was denied access to the grievance system with respect to the Emminger issue, and cannot be penalized for any failure to exhaust."  *Id.*  These allegations were not in the Complaint or ASC and Craig's failure to submit any materials in response to the prior Order renders the assertions in his Response unsupported.

while Craig was nearby, is not plausible because it does not allege a malicious and sadistic use of force against Craig for the very purpose of causing harm to him.  *Young*, 801 F.3d at 180.

      **H.**        **Due Process and Retaliation Claims – Placement in the RHU/Transfer**

      Craig asserts two distinct claims based on his placement in the RHU.  First, he asserts that Defendant Cloninger issued a retaliatory misconduct accusing him of possessing contraband and tampering with prison property when he tried to make a photocopy of a Christmas – New Years holiday closing schedule for the library.  Compl. at 9.  He asserts that Defendants Charles Hensley, Terra, and other members of the Program Review Committed ("PRC") did not initially know what the misconduct was for, but ultimately determined that he was investigated and confined to the RHU for reading and discussing the holiday closing schedule.  *Id.*  He claims he was held in the RHU for the maximum time allowed without charges before being released, during which time he could not access the law library even though he had legal deadlines pending, as punishment for misusing the law library.  *Id.*

      Separately, he asserts that after the named Defendants were notified that Craig had filed this action, and he again raised the issue of disposal of sacred texts with Bauer, he also received a misconduct accusing him of using a homophobic slur during his interaction with Bauer.  ASC at 6-7.  He claims the misconduct report for this latter incident was dismissed with prejudice following a hearing.  *Id*. at 7.  Nonetheless, he was taken to the RHU later that day, allegedly at Bauer's "behest" and that Bauer requested that he be transferred to a different prison.  *Id.*  The PRC, consisting of Defendants Hensley, Kertes, Muick and others, allegedly denied him due process by ordering him transferred to SCI Benner, even though he concedes that he received a hearing prior to the action.  *Id*. at 7-8.   He asserts that Bauer retaliated against him for asserting

his right to due process in the misconduct proceeding and for asserting his free exercise right.  *Id.* at 7.

Craig's allegations concerning his two placements in the RHU do not state plausible claims.  First, it is well-settled that a convicted prisoner's placement in segregated confinement will generally not create a liberty interest.  *Sandin*, 515 U.S. at 486; *Allah v. Seiverling*, 229 F.3d 220, 224 (3d Cir. 2000).  Also, because a prisoner has no liberty interest in his housing placement, he has failed to allege a plausible due process claim based upon his subsequent transfer to SCI Benner.  *See Thompson v. Pitkins*, 514 F. App'x 88, 89 (3d Cir. 2013) ("prisoners have no liberty interest arising from the Due Process Clause in a particular place of confinement") (citing *Olim v. Wakinekona*, 461 U.S. 238, 245-46 (1983)).  Thus, there can be no plausible due process claim arising from his placement in the RHU.

In order to state a plausible First Amendment retaliation claim, a prisoner must allege that: (1) he engaged in constitutionally protected conduct; (2) he suffered an adverse action sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and (3) the constitutionally protected conduct was "a substantial or motivating factor" for the adverse action.  *See Coit v. Garman*, 812 F. App'x 83, 86 (3d Cir. 2020) (*per curiam*); *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003); *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001).  "An adverse consequence 'need not be great in order to be actionable[;]' rather, it need only be 'more than *de minimis*.'"  *Watson*, 834 F.3d at 423 (quoting *McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006)) (alterations in original).  "[B]eing placed in lockdown, being moved to restricted housing, and being issued misconduct charges are more than '*de minimis*' adverse actions." *See Palmore v. Hornberger*, 813 F. App'x 68, 70 (3d Cir. 2020) (*per curiam*) (quoting *McKee*, 436 F.3d at 170); *see also Mitchell*, 318 F.3d at 530-31 ("Mitchell's allegation that he was falsely charged

44

with misconduct in retaliation for filing complaints against Officer Wilson implicates conduct protected by the First Amendment.").  The timing of the allegedly retaliatory behavior relative to the constitutionally protected conduct may establish a causal link between the two for purposes of establishing motivation.  *See Watson*, 834 F.3d at 422.

A prisoner's filing of a grievance is constitutionally protected conduct.  *See Robinson v. Taylor*, 204 F. App'x 155, 157 (3d Cir. 2006) (citing *Mitchell*, 318 F.3d at 530; *Davis v. Goord*, 320 F.3d 346, 35-53 (2d Cir. 2003)).  The filing of a lawsuit also generally "satisfies the constitutionally protected conduct prong of a retaliation claim."  *DeFranco v. Wolfe,* 387 F. App'x 147, 157 (3d Cir. 2010) (stating that there is "no doubt that filing a lawsuit is constitutionally protected conduct" for purposes of a retaliatory transfer claim).  A prisoner must allege a causal link between the protected conduct and the alleged act of retaliation.  *See, e.g.*, *Hammonds v. Headman*, 645 F. App'x 149, 152 (3d Cir. 2016) (*per curiam*) ("[B]ecause Hammonds' conclusory allegations fail to raise the required inference of a causal link between his grievance and the filing of misconduct reports, he failed to state a retaliation claim."); *Thomas v. Brinich*, 579 F. App'x 60, 62 (3d Cir. 2014) (*per curiam*) ("Thomas' claims against Dr. Ahner consist of conclusory and somewhat cryptic allegations that Dr. Ahner took Thomas off medication, directed others to do the same, and ordered others to create an extreme and stressful prison environment in retaliation for his 2001 lawsuit.  The complaint lacks all detail as to the time, place, or manner surrounding the alleged deprivation and it is entirely unclear from the allegations what level of involvement, if any, Dr. Ahner had in Thomas' care").

Craig also fails to allege plausible retaliation claims.  His placement in the RHU following his attempt to photocopy the library's holiday closing schedule does not implicate arguably protected conduct.  While he asserts that he could not conduct legal research while he

45

was housed in the RHU, Craig's allegations make clear that he was not retaliated against for attempting to conduct legal research, but rather for possessing contraband and tampering with prison property.  His allegation that he was issued a misconduct based on his using a homophobic or racial slur when interacting with Bauer about disposal of sacred texts, leading to his placement in the RHU pending his transfer to SCI Benner, also does not implicate protected conduct.  Even a liberal construction of Craig's allegations indicate he was transferred due to his continued interpersonal conflict with Bauer rather than because of his exercise of protected conduct.

### I.        Conditions of Confinement in the RHU

Finally, Craig alleges that while in the RHU from February 2 to 14, 2024, he was exposed to raw sewage leaking into his cell through cracks in the wall, RHU "staff" acknowledged knowing about the problem, he had to eat his meals in these conditions, and his complaints about this were ignored.  ASC at 8-9.  He asserts that Defendant Taylor supervised the RHU.  *Id*. at 9.  He also complains that the window in his cell was opaque causing sensory deprivation and he did not have access to his property.  *Id*. at 9, 11.

The Eighth Amendment governs claims brought by convicted inmates challenging their conditions of confinement.  *Hubbard v. Taylor*, 399 F.3d 150, 166 (3d Cir. 2005).  Unconstitutional punishment typically includes both objective and subjective components.  *Stevenson v. Carroll*, 495 F.3d 62, 68 (3d Cir. 2007).  The objective component requires an inquiry into whether "the deprivation [was] sufficiently serious" and the subjective component asks whether "the officials act[ed] with a sufficiently culpable state of mind[.]"  *Id.* (citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991); *Bell*, 441 U.S. at 538-39, 539 n.20).  In general, a prisoner must assert that prison officials acted with deliberate indifference, meaning that they

consciously disregarded a serious risk to the detainee's health or safety.  *See Seiter*, 501 U.S. at 298-99; *see also Wilson v. Burks*, 423 F. App'x 169, 173 (3d Cir. 2011) (*per curiam*) ("'[T]he official must both be aware of facts from which the inference could be drawn that a substantial harm exists, and he must also draw that inference.'") (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)); *cf. Edwards v. Northampton Cnty.*, 663 F. App'x 132, 135 (3d Cir. 2016) (*per curiam*) ("[W]e agree with the District Court and find no reason to apply a different standard here as we have applied the 'deliberate indifference' standard both in cases involving prisoners and pretrial detainees." (internal citations omitted)).

To establish an Eighth Amendment violation based on the conditions of confinement, a prisoner must establish that prison officials' acts or omissions denied him "the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981); *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 256 (3d Cir. 2010) (stating that the Eighth Amendment's prohibition of cruel and unusual punishment requires that prison officials provide "humane conditions of confinement.").  Such necessities include food, clothing, shelter, medical care and reasonable safety.  *Tillman v. Lebanon Cnty. Corr. Facility*, 221 F.3d 410, 418 (3d Cir. 2000). "However, where conditions are not 'cruel and unusual' but merely 'restrictive and even harsh,' they do not violate the Eighth Amendment but rather 'are part of the penalty that criminal offenders pay for their offenses against society.'" *Barndt v. Wenerowicz*, 698 F. App'x 673, 677 (3d Cir. 2017) (*per curiam*) (quoting *Rhodes*, 452 U.S. at 347).  Stated another way, conditions that are merely unpleasant are not cruel and unusual.  *Payton v. Vaughn*, 798 F. Supp. 258, 260-61 (E.D. Pa. 1992) ("The Plaintiff has alleged that the prison conditions at SCIG were unpleasant, however, unpleasant prison conditions in and of themselves do not state a cognizable eighth amendment claim."); *Williams v. Lyons*,  No. 89-2278, 1989 WL 32764, *1 (E.D. Pa.

April 3, 1989) (holding that presence of rats and bugs does not violate Eighth Amendment); *McKnight v. Murphy*, No. 89-2196, 1989 WL 32768, *1 (E.D. Pa. April 3, 1989) (holding same regarding allegations of "bugs, rats, unclean and unsanitary conditions").

A prisoner must also establish that the defendants acted with deliberate indifference. *Farmer*, 511 U.S. at 835. A claim based on mere negligence is insufficient to allege a plausible Eighth Amendment violation. *See Whitley*, 475 U.S. at 319 ("It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock.").

Craig's allegations about the twelve days he spent in the RHU do not allege an objectively serious deprivation. While exposure to human waste "carries particular weight in the conditions calculus," *Martin v. Gearhart*, 712 F. App'x 179, 187 (3d Cir. 2017) (*per curiam*) (quoting *DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001)), the assertion that Craig's cell simply had a sewage leak and he had to have his meals in his cell are generally not the type of claims that courts deem to be an objectively serious deprivation. *See Smith v. U.S. Penitentiary Lee*, No. 11-77, 2011 WL 767165, at *2 (W.D. Va. Feb. 25, 2011) (plaintiff failed to state claim based on allegations that he was required to eat meals in cell with toilet sometimes filled with excrement). More importantly, Craig does not tie this allegation to a named Defendant who had both objective knowledge of the condition and the subjective state of mind to make the claim plausible, alleging only that "staff" on the unit were supervised by Defendant Taylor. The assertion that his cell window was opaque is also not a serious deprivation since he does not allege he was deprived of light. Although lack of access to natural light over a lengthy period

48

may constitute a constitutional deprivation, *see Robinson v. Corriveau*, No. 95-1126, 1995 WL 736276 (10th Cir. 1995) ("[Plaintiff] alleged that he has been deprived of natural light and fresh air for the past seven months (now thirteen months). It is unlikely that such extended deprivation of natural light and air would meet the minimal health and safety needs of prisoners."), a twelve-day period where his window was "opaque" would not rise to the level of a constitutional violation since Craig does not allege he had no access to light either natural or from another source. *See Palermo v. Coos Cnty. Dep't of Corr.*, No. 08-109-JL, 2008 WL 4200102, at *4 (D.N.H. Sept. 11, 2008) (finding "no legal authority for the proposition that light must be natural light to be considered constitutionally adequate"); *Preece v. Cooke*, No. 13-03265, 2014 WL 6440406, at *11 (D. Colo. Nov. 17, 2014) ("Plaintiffs allegations that he was denied access to fresh air, outdoor exercise, a "pull-up bar," and access to natural light do not allege that he was deprived of a human need.")

## V.    CONCLUSION

For the reasons stated at length, the Motions to Dismiss Craig's Complaint filed by David Dunn Bauer and the Commonwealth Defendants will be granted.[18]  A final Order of dismissal will be entered separately. Fed. R. Civ. P. 58(a).

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*
**JOSEPH F. LEESON, JR.**
**United States District Judge**

---

[18]    Having determined that none of Craig's claims against the Defendants who were actually served survive the pleadings stage, claims against unserved Defendants "John and Jane Does 1-8" will also be dismissed based on the Court's screening authority in 28 U.S.C. § 1915(e)(2)(B)(ii) since Craig makes no substantive allegations about these unknown defendants.